Daniel Sadeh, Esq.
**HALPER SADEH LLP**
375 Park Avenue, Suite 2607
New York, NY 10152
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RALPH VOLLWEILER,<br><br>        Plaintiff,<br><br>    v.<br><br>CINCINNATI BELL INC., LYNN A. WENTWORTH, MEREDITH J. CHING, WALTER A. DODS, JR., JOHN W. ECK, LEIGH R. FOX, JAKKI L. HAUSSLER, CRAIG F. MAIER, RUSSEL P. MAYER, THEODORE H. TORBECK, and MARTIN J. YUDKOVITZ,<br><br>        Defendants. | Case No:<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Ralph Vollweiler ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

## <u>NATURE OF THE ACTION</u>

1.      This is an action against Cincinnati Bell Inc. ("Cincinnati Bell" or the "Company"), and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Cincinnati Bell by Charlie AcquireCo Inc. ("Parent") and Charlie Merger Sub Inc. ("Merger Sub"), a wholly owned subsidiary of Parent.[1]

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in New York.[2]

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

---

[1] According to the Proxy Statement, in connection with the Proposed Transaction, the "Brookfield Funds" (certain controlled investment vehicles through which Brookfield Infrastructure Group carries out its investment activities) have committed to capitalize Parent, on the date of the closing of the Proposed Transaction, with the full amount in cash necessary to fund the aggregate consideration for the Proposed Transaction, subject to the terms and conditions of the equity funding letter from the Brookfield Funds, dated as of December 21, 2020.

[2] For example, on December 10, 2019, the Company reportedly participated in a business conference in New York, New York. *See* Cincinnati Bell Inc., *Event Details*, https://investor.cincinnatibell.com/events-and-presentations/event-details/2019/UBS-47th-Annual-Global-Media-and-Communications-Conference/default.aspx (last visited Feb. 28, 2020).

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff is, and has been at all relevant times hereto, an owner of Cincinnati Bell's common stock.

7.      Defendant Cincinnati Bell, together with its subsidiaries, provides diversified telecommunications and technology services to residential and business customers in the United States. The Company is incorporated in Ohio. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol, "CBB."

8.      Defendant Lynn A. Wentworth ("Wentworth") is Board Chair of the Company.

9.      Defendant Meredith J. Ching ("Ching") is a director of the Company.

10.     Defendant Walter A. Dods, Jr. ("Dods") is a director of the Company.

11.     Defendant John W. Eck ("Eck") is a director of the Company.

12.     Defendant Leigh R. Fox ("Fox") is President, Chief Executive Officer, and a director of the Company.

13.     Defendant Jakki L. Haussler ("Haussler") is a director of the Company.

14.     Defendant Craig F. Maier ("Maier") is a director of the Company.

15.     Defendant Russel P. Mayer ("Mayer") is a director of the Company.

16.     Defendant Theodore H. Torbeck ("Torbeck") is a director of the Company.

17.     Defendant Martin J. Yudkovitz ("Yudkovitz") is a director of the Company.

18.     Defendants Wentworth, Ching, Dods, Eck, Fox, Haussler, Maier, Mayer, Torbeck, and Yudkovitz are collectively referred to herein as the "Individual Defendants."

19.     Defendants Cincinnati Bell and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

20.     On December 23, 2019, Cincinnati Bell issued a press release announcing an agreement through which Brookfield Infrastructure and its institutional partners would acquire each issued and outstanding share of Cincinnati Bell common stock for $10.50 in cash. The press release states, in pertinent part:

### Cincinnati Bell Inc. To Be Acquired By Brookfield Infrastructure In $2.6 Billion Transaction

NEWS PROVIDED BY
**Cincinnati Bell Inc.**
Dec 23, 2019, 06:45 ET

CINCINNATI, Dec. 23, 2019 /PRNewswire/ -- Cincinnati Bell Inc. (NYSE:CBB), together with Brookfield Infrastructure (NYSE: BIP; TSX: BIP.UN), today announced an agreement through which Brookfield Infrastructure and its institutional partners will acquire Cincinnati Bell in a transaction valued at approximately $2.6 billion, including debt (the "Transaction").

Pursuant to the agreement, each issued and outstanding share of Cincinnati Bell common stock will be converted into the right to receive $10.50 in cash at closing of the Transaction. The Transaction price of $10.50 per share of Cincinnati Bell common stock represents a 36% premium to the closing per share price of $7.72 on December 20, 2019 and an 84% premium to the 60-day volume weighted average price. The Transaction has received unanimous approval of Cincinnati Bell's Board of Directors and is subject to customary closing conditions, including Cincinnati Bell shareholder approval and regulatory approval.

*     *     *

"This investment represents an opportunity for Brookfield Infrastructure to acquire a great franchise and leading fiber network operator in North America," said Sam Pollock, Chief Executive Officer of Brookfield Infrastructure. "We are excited to leverage our operating expertise to work with the company's management team as it completes its industry-leading fiber optic rollout plan. Cincinnati Bell is a great

addition to our data infrastructure portfolio and we expect it will contribute strong utility-like cash flows with predictable growth."

Cincinnati Bell owns and operates the leading data transmission and distribution network in Cincinnati, Ohio and Hawaii, with a footprint of over 1.3 million homes, delivering core fiber broadband, video and voice services to residential and enterprise customers. The business is undergoing an industry-leading transformation to upgrade its network to next generation fiber, which will be critical to support the growing demand for data and the advent of 5G. Thus far, Cincinnati Bell has future-proofed 50% of its network, representing more than 17,000 miles of dense metro and last-mile fiber and has plans to further upgrade its network over the next few years. The ongoing fiber upgrade allows Cincinnati Bell to provide utility-like services for broadband and data, generating stable and growing cash flows.

Brookfield Infrastructure is a leading global company with a long-standing history as an owner and operator of high-quality infrastructure assets. It has a global portfolio of assets in the utilities, transport, energy and data infrastructure sectors across North and South America, Asia Pacific and Europe.

The Transaction is expected to close by the end of 2020. It is subject to certain customary closing conditions, including the approval by Cincinnati Bell's shareholders, expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and certain regulatory approvals. Cincinnati Bell will file a current report on Form 8-K with the U.S. Securities and Exchange Commission containing a summary of the terms and conditions of the proposed acquisition as well as a copy of the merger agreement.

**Advisors**

White & Case LLP is serving as lead legal advisor to Brookfield Infrastructure on this Transaction. Financing will be led by a syndicate of banks including Bank of America, BMO Capital Markets Corp., Citigroup Global Markets Inc., TD Securities and Wells Fargo Securities, LLC.

Morgan Stanley & Co. LLC and Moelis & Company LLC are acting as financial advisors and Cravath, Swaine & Moore LLP, Morgan, Lewis & Blockius LLP, and BosseLaw PLLC are acting as legal advisors to Cincinnati Bell.

21.     On February 4, 2020, Defendants caused to be filed with the SEC a Schedule 14A

Preliminary Proxy Statement in connection with the Proposed Transaction (the "Proxy

Statement").

22.     On February 28, 2020, the Company issued a press release announcing that it had

amended its definitive merger agreement with Brookfield Infrastructure and its institutional partners to increase the consideration payable to holders of outstanding shares of Cincinnati Bell common stock to $12.50 per share in cash from $10.50 per share in cash. The press release states, in pertinent part:

### Cincinnati Bell Inc. and Brookfield Infrastructure Sign Amended Merger Agreement

NEWS PROVIDED BY
**Cincinnati Bell Inc.**
Feb 28, 2020, 06:45 ET

CINCINNATI, Feb. 28, 2020 /PRNewswire/ -- Cincinnati Bell Inc. (NYSE:CBB) ("Cincinnati Bell") today announced that it has amended its definitive merger agreement with Brookfield Infrastructure and its institutional partners (collectively referred to as "Brookfield") to increase the consideration payable to holders of outstanding shares of Cincinnati Bell common stock to $12.50 per share in cash from $10.50 per share in cash, which values the transaction at approximately $2.745 billion, including debt.  The revised transaction price represents a 62% premium to the closing per share price of $7.72 on December 20, 2019, the last trading day prior to the date when the merger agreement was entered into.

Cincinnati Bell and Brookfield negotiated the amendment following the receipt by Cincinnati Bell on February 27, 2020 of a binding proposal (the "Proposal") to acquire all outstanding shares of Cincinnati Bell common stock for $12.50 from the infrastructure fund that previously submitted a non-binding proposal on January 22, 2020. Cincinnati Bell's Board, in consultation with its legal and financial advisors, carefully reviewed the terms of the Proposal and the amended Brookfield transaction and determined that entering into the amendment to the Brookfield merger agreement was in the best interests of Cincinnati Bell and its shareholders. Cincinnati Bell's Board of Directors approved the amended merger agreement and recommends that Cincinnati Bell's shareholders vote in favor of adopting the amended Brookfield merger agreement.

Lynn A. Wentworth, Chairman of the Cincinnati Bell Board of Directors, said, "After receiving a binding proposal reflecting a higher purchase price for Cincinnati Bell, Cincinnati Bell advised Brookfield of the proposal, which led to Brookfield increasing the price of our transaction with them. Following these discussions, our Board approved the amendment to the merger agreement. We believe the amended merger agreement is a result of a well-run sales process that allows our shareholders to realize higher value for their shares."

Leigh Fox, President and Chief Executive Officer of Cincinnati Bell, said, "We look forward to continuing to work to complete the closing of the merger with Brookfield. We continue to be confident in the strategic and financial rationale of this transaction, as well as our ability to drive growth and maximize value for our shareholders. With Brookfield's support, we look forward to enhancing our fiber network, driving long-term benefits for our customers."

Cincinnati Bell will file a current report on Form 8-K with the U.S. Securities and Exchange Commission containing a summary of the terms and conditions of the amendment to the definitive merger agreement. In the amendment, in consideration for the increased purchase price, the break-up fee payable by Cincinnati Bell in certain circumstances has increased from $17.97 million to $21.39 million. All other terms of the Brookfield merger agreement remain the same.

The Transaction is subject to certain customary closing conditions, including the approval by Cincinnati Bell's shareholders, expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and certain regulatory approvals, and is expected to close by the end of 2020.

**Advisors**

Morgan Stanley & Co. LLC and Moelis & Company LLC are acting as financial advisors to Cincinnati Bell and Cravath, Swaine & Moore LLP, Morgan, Lewis & Bockius LLP and BosseLaw PLLC are acting as legal advisors.

## B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions

23.     The Proxy Statement, which recommends that Cincinnati Bell shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Cincinnati Bell's financial projections; (ii) the financial analyses performed by the Company's financial advisors, Morgan Stanley & Co. LLC ("Morgan Stanley ") and Moelis & Company LLC ("Moelis"), in connection with their fairness opinions; (iii) the sales process leading up to the Proposed Transaction; and (iv) potential conflicts of interest involving Moelis.

24.     The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger; (ii) Recommendation of the Board; (iii) Reasons for the Merger; (iv) Financial Forecasts; and (v) Opinion of the Company's Financial Advisors.

25.     Unless and until the material misstatements and omissions (referenced below) are remedied before the anticipated shareholder vote, Cincinnati Bell shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

**1.    Material Omissions Concerning Cincinnati Bell's Financial Projections**

26.     The Proxy Statement omits material information concerning Cincinnati Bell's financial projections.

27.     The Proxy Statement provides that:

[A]s part of the development of the Company's long term plan and in connection with the Company's review of strategic alternatives, including a potential sale of the Company, in September 2019 the Company's management prepared certain financial projections for the fiscal years 2020 through 2023 (the "September Forecasts").

28.     The Proxy Statement provides that:

In December 2019, the Company's management performed its annual, normal course five year planning process. As a result of this process, the Company's management made certain updates to the September Forecasts to reflect the actual business results for the fiscal quarter ended September 30, 2019, the competitive landscape and the business opportunities available to the Company (such updated forecasts, the "December Forecasts", and together with the September Forecasts, the "Financial Forecasts").

29.     The Proxy Statement presents tables setting forth summaries of the September Forecasts and December Forecasts.

30.     The Proxy Statement, however, fails to disclose the following concerning the September Forecasts and December Forecasts: (1) all line items used to calculate (i) Adjusted

EBITDA, and (ii) Unlevered Free Cash Flow;[3] and (2) a reconciliation of all non-GAAP to GAAP metrics.

31.     When a company discloses non-GAAP financial metrics in a Proxy Statement that were relied upon by its board in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100. The SEC has increased its scrutiny of a company's use of non-GAAP financial measures as such measures can be misleading and "crowd out" more reliable GAAP information.[4]

32.     The disclosure of Cincinnati Bell's projected financial information is material because it would provide Cincinnati Bell shareholders with a basis to project the future financial performance of Cincinnati Bell and would allow shareholders to better understand the financial analyses performed by the Company's financial advisors in support of their fairness opinions.

---

[3] The Proxy Statement provides that "Unlevered Free Cash Flow" is "defined as Adjusted EBITDA less capital expenditures," and purports to provide figures for Adjusted EBITDA and capital expenditure. The Proxy Statement, however, fails to provide the line items underlying Adjusted EBITDA.

[4] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Feb. 28, 2020) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Cincinnati Bell and its financial advisors, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisors' fairness opinions in determining whether to vote for or against the Proposed Transaction.

33.     Accordingly, in order to bring the Proxy Statement into compliance with SEC regulations, as well as to cure the materially misleading nature of the September Forecasts and December Forecasts, Defendants must provide a reconciliation table of the aforementioned non-GAAP metrics to their most comparable GAAP metrics. Defendants must also disclose the line item projections that were used to calculate these non-GAAP metrics. Such projections are necessary to make the non-GAAP projections included in the Proxy Statement not misleading.

34.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Cincinnati Bell shareholders.

**2. Material Omissions Concerning Morgan Stanley's and Moelis' Financial Analyses**

35.     In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Morgan Stanley and Moelis.

36.     The valuation methods, underlying assumptions, and key inputs used by Morgan Stanley and Moelis in rendering their purported fairness opinions must be fairly disclosed to Cincinnati Bell shareholders. The description of Morgan Stanley's and Moelis' fairness opinions and analyses, however, fail to include key inputs and assumptions underlying those analyses. Without the information described below, Cincinnati Bell shareholders are unable to fully understand these fairness opinions and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed

Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Cincinnati Bell shareholders.

**a.** ***Morgan Stanley's Financial Analyses***

37.    The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Discounted Future Equity Value Analysis*": (1) the range of AV / EBITDA Ratios; (2) the future amount of net debt and preferred equity; and (3) the individual inputs and assumptions underlying the range of discount rates between 11.7% and 12.9%.

38.    The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Discounted Cash Flow Analysis*": (1) the estimated unlevered free cash flows, and all underlying line items; (2) the fully diluted share count as of December 17, 2019; (3) the individual inputs and assumptions underlying the (i) range of discount rates from 7.4% to 7.8%, and (ii) range of exit multiples from 5.5x to 6.25x; (4) the range of implied terminal values for the Company; and (5) the amount of the net operating losses.

39.    With respect to Morgan Stanley's analysis of future public market trading price targets for the Company's common stock, the Proxy Statement fails to disclose: (1) the individual price targets for Cincinnati Bell observed by Morgan Stanley in its analysis; and (2) the sources of those price targets.

**b.** ***Moelis' Financial Analyses***

40.    The Proxy Statement fails to disclose the following concerning Moelis' "*Discounted Cash Flow Analysis*": (1) the individual inputs and assumptions underlying the (i) range of discount rates of 8.00% to 9.25%; and (ii) range of estimated terminal values of 5.75x to 6.50x estimated terminal year Adjusted EBITDA; and (2) the Company's estimated after-tax unlevered free cash flows for fiscal years 2020 through 2024, and all underlying line items.

41.     With respect to Moelis' analysis of the one-year forward stock price targets for the Company's common stock, the Proxy Statement fails to disclose: (1) the individual price targets for Cincinnati Bell observed by Moelis in its analysis; and (2) the sources of those price targets.

**3.   Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction**

42.     The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

43.     The Proxy Statement provides that, "[o]n December 15, 2019, the Company entered into a confidentiality agreement with Party E[,]" but fails to disclose whether the Company's confidentiality agreement with Party E contained a standstill provision with a "don't ask, don't waive" provision (including its time of enforcement) that would preclude Party E from making any offers for Cincinnati Bell.

44.     Without this information, the Company's shareholders may have the mistaken belief that potential buyers are or were permitted to submit superior proposals for the Company, when in fact they are or were contractually prohibited from doing so. This information is material because a reasonable Cincinnati Bell shareholder would want to know, prior to voting for or against the Proposed Transaction, whether other potential buyers are or were foreclosed from submitting a superior proposal.

**4.   Material Omissions Concerning Potential Conflicts of Interest Involving Moelis**

45.     The Proxy Statement omits material information concerning potential conflicts of interest involving Moelis.

46.     The Proxy Statement provides that "Moelis provided investment banking and other services to the Company and Brookfield Infrastructure or its affiliates unrelated to the Transaction . . . and have received . . . compensation for such services."

12

47.     The Proxy Statement then proceeds to list past services that Moelis purportedly provided to the Company and Brookfield Infrastructure or its affiliates, but fails to disclose whether those services encompass all the services Moelis provided to the Company and Brookfield Infrastructure or its affiliates during the two years preceding the date of its fairness opinion.

48.     Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

49.     The omission of the above-referenced information renders the Proxy Statement materially incomplete and misleading. This information, if disclosed, would significantly alter the total mix of information available to Cincinnati Bell shareholders.

## <u>COUNT I</u>
### **For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder<br>Against All Defendants**

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

52.     Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the

mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

53.     The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

54.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

55.     Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

56.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.     The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

58.     Each of the Individual Defendants was provided with or had unlimited access to

copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

59.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

60.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

61.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

62.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions

as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: February 28, 2020                    Respectfully submitted,

                                            **HALPER SADEH LLP**

                                            By: /s/ Daniel Sadeh
                                            Daniel Sadeh, Esq.
                                            Zachary Halper, Esq. (to be admitted *pro hac vice*)

375 Park Avenue, Suite 2607
New York, NY 10152
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
          zhalper@halpersadeh.com

*Counsel for Plaintiff*